UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JASON MICHAEL JEFFORDS,                    17-CV-1085-MJR
                                           DECISION AND ORDER
                Plaintiff,

        -v-

COMMISSIONER OF SOCIAL SECURITY,[1]

                Defendant.
_____

        Pursuant to 28 U.S.C. §636(c), the parties consented to have a United States

Magistrate Judge conduct all proceedings in this case. (Dkt. No. 14).

        Plaintiff Jason Michael Jeffords ("plaintiff") brings this action pursuant to 42 U.S.C.

§§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner

of Social Security ("Commissioner" or "defendant") denying him Disability Insurance

Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have moved for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

For the following reasons, plaintiff's motion (Dkt. No. 11) is granted, defendant's motion

(Dkt. No. 16) is denied and the matter is remanded to the Commissioner for further

administrative proceedings consistent with this Decision and Order.

## BACKGROUND

        Plaintiff filed an application for DIB on May 28, 2013 alleging disability since March

8, 2010 due to a mid and lower back injury, spinal disc herniation and arthritis. (*See* Tr.

19, 82, 177-78).[2] Plaintiff's disability benefits application was initially denied on August

_____

[1] The Clerk of Court is directed to amend the caption accordingly.
[2] References to "Tr." are to the administrative record in this case.

15, 2013. (Tr. 29, 82-90, 93-103). Plaintiff sought review of the determination, and hearings were held before Administrative Law Judge ("ALJ") Eric Glazer on April 21, 2015 and October 22, 2015, where ALJ Glazer heard testimony from plaintiff, who was represented by an attorney, and a vocational expert.[3] (Tr. 34-81). On March 30, 2016, ALJ Glazer issued a decision that plaintiff was not disabled under the Act. (Tr. 16-29). Plaintiff timely sought review of the decision by the Appeals Council. (Tr. 33-34). Plaintiff's request for review of the decision was denied by the Appeals Council on August 31, 2017. (Tr. 1-6). The ALJ's November 27, 2015 denial of benefits became the Commissioner's final determination, and the instant lawsuit followed.

Born on August 11, 1975, plaintiff was thirty-four years old at the time of the alleged onset date and forty years old at the time of the ALJ's March 2016 decision. (Tr. 28). Plaintiff has a high school education. (*Id.*).

## DISCUSSION

### I.    *Scope of Judicial Review*

The Court's review of the Commissioner's decision is deferential. Under the Act, the Commissioner's factual determinations "shall be conclusive" so long as they are "supported by substantial evidence," 42 U.S.C. §405(g), that is, supported by "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). "The substantial evidence test applies not only to findings on basic

---

[3] Only plaintiff testified at the initial hearing on April 21, 2015. (Tr. 19). On April 23, 2015, the ALJ sent interrogatories to Vocational Expert ("VE") Timothy Janikowski, Ph.D. (*Id.*). The VE's responses were received on May 7, 2015 and sent to plaintiff's counsel on May 12, 2015. (*Id.*). On May 19, 2015, plaintiff's counsel requested a supplemental hearing to question the VE. (*Id.*). A supplemental hearing was held on October 22, 2015, which included the testimony of both plaintiff and the VE. (*Id.*).

evidentiary facts, but also to inferences and conclusions drawn from the facts." *Smith v. Colvin*, 17 F. Supp. 3d 260, 264 (W.D.N.Y. 2014). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the Court may "not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). Thus, the Court's task is to ask "'whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached' by the Commissioner." *Silvers v. Colvin*, 67 F. Supp. 3d 570, 574 (W.D.N.Y. 2014) (*quoting Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

Two related rules follow from the Act's standard of review. The first is that "[i]t is the function of the [Commissioner], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). The second rule is that "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino*, 312 F.3d at 588. While the applicable standard of review is deferential, this does not mean that the Commissioner's decision is presumptively correct. The Commissioner's decision is, as described above, subject to remand or reversal if the factual conclusions on which it is based are not supported by substantial evidence. Further, the Commissioner's factual conclusions must be applied to the correct legal standard. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). Failure to apply the correct legal standard is reversible error. *Id.*

II.     *Standards for Determining "Disability" Under the Act*

A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of

not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Commissioner may find the claimant disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* §423(d)(2)(A). The Commissioner must make these determinations based on "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and . . . [the claimant's] educational background, age, and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (first alteration in original) (*quoting Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)).

To guide the assessment of whether a claimant is disabled, the Commissioner has promulgated a "five-step sequential evaluation process." 20 C.F.R. §404.1520(a)(4). First, the Commissioner determines whether the claimant is "working" and whether that work "is substantial gainful activity." *Id.* §404.1520(b). If the claimant is engaged in substantial gainful activity, the claimant is "not disabled regardless of [his or her] medical condition or . . . age, education, and work experience." *Id.* Second, if the claimant is not engaged in substantial gainful activity, the Commissioner asks whether the claimant has a "severe impairment." *Id.* §404.1520(c). To make this determination, the Commissioner asks whether the claimant has "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* As with the first step, if the claimant does not have a severe impairment, he or she is

not disabled regardless of any other factors or considerations. *Id.* Third, if the claimant does have a severe impairment, the Commissioner asks two additional questions: first, whether that severe impairment meets the Act's duration requirement, and second, whether the severe impairment is either listed in Appendix 1 of the Commissioner's regulations or is "equal to" an impairment listed in Appendix 1. *Id.* §404.1520(d). If the claimant satisfies both requirements of step three, the Commissioner will find that he or she is disabled without regard to his or her age, education, and work experience. *Id.*

If the claimant does not have the severe impairment required by step three, the Commissioner's analysis proceeds to steps four and five. Before doing so, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity ["RFC"] based on all the relevant medical and other evidence" in the record. *Id.* §404.1520(e). RFC "is the most [the claimant] can still do despite [his or her] limitations." *Id.* §404.1545(a)(1). The Commissioner's assessment of the claimant's RFC is then applied at steps four and five. At step four, the Commissioner "compare[s] [the] residual functional capacity assessment . . . with the physical and mental demands of [the claimant's] past relevant work." *Id.* §404.1520(f). If, based on that comparison, the claimant is able to perform his or her past relevant work, the Commissioner will find that the claimant is not disabled within the meaning of the Act. *Id.* Finally, if the claimant cannot perform his or her past relevant work or does not have any past relevant work, then at the fifth step the Commissioner considers whether, based on the claimant's RFC, age, education, and work experience, the claimant "can make an adjustment to other work." *Id.* §404.1520(g)(1). If the claimant can adjust to other work, he or she is not

disabled.  *Id.*  If, however, the claimant cannot adjust to other work, he or she is disabled within the meaning of the Act.  *Id.*

The burden through steps one through four described above rests on the claimant. If the claimant carries their burden through the first four steps, "the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform."  *Carroll*, 705 F.2d at 642.

III.  *The ALJ's Decision*

The ALJ first found that plaintiff met the insured status requirements of the Act through December 31, 2015.  (Tr. 21).  The ALJ then followed the required five-step analysis for evaluating plaintiff's claim.  Under step one, the ALJ found that plaintiff has not engaged in substantial gainful activity since the alleged onset date of March 8, 2010.[4] (*Id.*)  At step two, the ALJ found that plaintiff has severe impairments consisting of: (1) lumbar spine pathology with surgery residuals; (2) thoracic spine impairment; and (3) cervical spine disc narrowing.  (Tr. 22).  At step three, the ALJ determined that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (*Id.*).  Before proceeding to step four, the ALJ assessed plaintiff's RFC as follows:

> [T]he [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)[5], with the following restrictions: no repetitive bending or twisting from the waist and reaching overhead; and no handling,

---

[4] The ALJ noted that plaintiff's earnings record indicated that he had $313.00 of posted earnings in the third quarter of 2013, after his alleged onset date.  (Tr. at 21).  The ALJ noted that plaintiff testified he was employed at Dick's Sporting Goods for a short period of time in 2013, which is consistent with his 2013 earnings.  (*Id.*).  A certified earnings record established that plaintiff had no earnings consistent with substantial gainful activity as of the alleged onset date.  (*Id.*).

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [a plaintiff] must have the ability to substantially all of these activities."  29 C.F.R. §404.1567(b).

sale or preparation of alcoholic beverages or controlled narcotic substances.

(*Id.*).

Proceeding to step four, the ALJ concluded, after considering testimony from the vocational expert, that plaintiff is unable to perform any of his past relevant work. (Tr. 27-28). Proceeding to step five and again after considering testimony from the vocational expert as well as plaintiff's age, education, work experience, and RFC, the ALJ concluded that there are other jobs that exist in significant numbers in the national economy that plaintiff can perform. (Tr. 28-29). Accordingly, the ALJ found that plaintiff has not been under a disability within the meaning of the Act from March 8, 2010 through the date of his decision. (*Id.*).

IV.  *Plaintiff's Challenges*

Plaintiff argues that remand is warranted because the ALJ relied on stale medical opinions, mischaracterized the medical evidence and failed to fully develop the record. (*See* Dkt. No. 11-1 (Plaintiff's Memo of Law)). After reviewing the ALJ's decision, the hearing transcript and the relevant medical evidence in the record, the Court finds that the matter should be remanded because the ALJ: (1) relied on stale medical opinions; (2) misapplied the treating physician rule; and (3) failed to fully develop the record.

*Plaintiff's Disability Application and Hearing Testimony*

On March 8, 2010, plaintiff seriously injured his back while working as an asbestos laborer at Fibertech Environmental Service. (Tr. 38-39, 191). Plaintiff testified that he was throwing bags of asbestos up a stairway when he felt sudden pain through his back and radiating down his legs. (*Id.*). He was taken to an immediate care facility and then to a hospital for treatment. (*Id.*). Prior to this position, plaintiff worked as a mill operator

7

at International Fiber from September 1998 through June of 2004. (Tr. 191). Plaintiff testified that he worked at Dick's Sporting Goods for two weeks in July of 2013 but could not continue because of his pain. (Tr. 56-57). Other than the two weeks he worked in July of 2013, plaintiff has not worked since his March 2010 back injury. (*Id.*).

Plaintiff testified that he experiences daily pain in his lower back, legs, arms, shoulders, and neck. (Tr. 50, 203). He can lift a gallon a milk but cannot carry it any distance. (Tr. 51-52). He can walk only 50 feet before needing to stop. (*Id.*). Plaintiff testified that he cannot bend, squat, reach or kneel. (*Id.*). Plaintiff indicates that his pain increases when sitting or standing and that he must constantly shift positions. (Tr. 203). Climbing stairs, kneeling, squatting and reaching also results in increased pain and restricted movement. (Tr. 204). Plaintiff uses a back brace when walking, sitting, standing, and performing household chores. (Tr. 205). Plaintiff testified that his pain increased after he underwent back surgery in 2013, and that he feels "rods and screws every day". (Tr. 56-57). Plaintiff testified that he is limited in the daily activities of cooking, cleaning, driving, laundry, and child care. (Tr. 71).

### Relevant Medical Evidence

Dr. John Ring, an examining doctor for the New York State Workers' Compensation Board ("Workers' Compensation Board"), examined plaintiff on April 8, 2011 due to his work-related back injury.[6] (Tr. 309). Dr. Ring diagnosed plaintiff with a dorsal lumbar strain with disc herniation at L5-Si, minimal listhesis at L5-Si and a disc herniation at T2-Ts related to the March 8, 2010 injury. (Tr. 309-11). Dr. Ring examined plaintiff again on August 8, 2011 and concluded that, for purposes of workers'

---

[6] The Workers' Compensation Board employs independent medical examiners to evaluate individuals for purposes of determining their temporary disability benefits. *See* 12 NYCRR § 300.2.

compensation benefits, plaintiff had a moderate partial disability pursuant to the Workers' Compensation Guidelines for Determining Impairment ("Workers' Compensation Guidelines"). (Tr. 306-308). Dr. Ring opined that plaintiff could work with a lifting restriction of less than 20 pounds and no repetitive bending. (*Id.*). Dr. Melvin Brothman also evaluated plaintiff on behalf of the Workers' Compensation Board. (Tr. 301-305). On December 11, 2011, Dr. Brothman diagnosed plaintiff with thoracic disc herniation and spondylolisthesis with bilateral pars defects. (*Id.*). Dr. Brothman examined plaintiff again on July 10, 2012 and diagnosed him with disk herniation and a prior history of neck injury. (Tr. 297-299). Dr. Brothman examined plaintiff for the last time on December 27, 2012 and opined that plaintiff had a moderate disability for purposes of the Workers' Compensation Guidelines. (Tr. 296). Dr. Brothman concluded that plaintiff could return to work with restrictions to avoid bending and lifting over 15-20 pounds and to avoid twisting and reaching overhead. (*Id.*).

Plaintiff regularly treated with Dr. Michael Calabrese of Medical Care WNY from immediately following his March 2010 back injury through June 26, 2014. During an examination in January 2013, plaintiff reported that he was experiencing constant, sharp pain in his mid-back and constant, aching pain in his low-back. (Tr. 494-495). Dr. Calabrese noted that plaintiff was constantly changing position. (*Id.*). He diagnosed plaintiff with thoracic sprain/strain, lumbar sprain/strain, thoracic disc herniation, and lumbar disc herniation. (Tr. 495). Dr. Calabrese recommended that plaintiff see a pain management specialist and directed continued use of Narco, a prescription pain medication. (Tr. 496). In March and April of 2014, plaintiff reported increased pain when sitting and worsening low-back pain with numbness to his leg. (Tr. 448, 455). In May of

2013, Dr. Calabrese found that plaintiff was temporarily totally impaired as a result of his 2010 back injury and that he was unavailable to return to gainful employment at that time. (Tr. 466-467). In August of 2013, Dr. Calabrese noted that plaintiff continued to experience significant impairment in his range of motion and mobility, was able to walk only one block without difficulty and needed to constantly change positions when sitting or standing. (Tr. 584). He noted that plaintiff was in "marked distress" and wearing a lumbosacral support orthotic. (Tr. 586). An examination of plaintiff's thoracolumbar spine showed significant tenderness and severe myospasms bilaterally, upper greater than lower as well as marked paraspinal muscle tenderness and palpable myospasms. (Tr. 586). Dr. Calabrese added "accurate exacerbation of mid and low back injuries" to the list of plaintiff's diagnoses. (Tr. 587). Dr. Calabrese also noted that he was continuing plaintiff on prescription pain medication due to the "acute exacerbation of his injuries." (Tr. 588-589). He ordered an MRI of plaintiff's thoracic, lumbar and cervical spine to evaluate the worsening pathology. (*Id.*). In September of 2013, Dr. Calabrese increased plaintiff's prescription pain mediation due to his increased pain and the exacerbation of his injuries. (Tr. 577-578). Dr. Calabrese also noted that as a result of the exacerbation of plaintiff's injuries, plaintiff was unable to be gainfully employed at that time. (*Id.*).

Plaintiff treated with Dr. Franco Vigna of Spine Surgery of Buffalo, LLC from September 2013 through December of 2014. On October 23, 2013, Dr. Vigna diagnosed plaintiff with neuritis or radiculitis, lumber intervertebral disc degeneration, thoracic intervertebral disc degeneration, and spondylolisthesis. (Tr. 656). Dr. Vigna found plaintiff to have a temporary impairment of 75%. (Tr. 657). Dr. Vigna performed a spine surgery on plaintiff on December 30, 2013, which included a lumbar fusion and insertion

of pedicle screws. (Tr. 639, 644). Plaintiff was discharged in stable condition on January 2, 2014. (Tr. 640). During a follow-up appointment in February of 2014, plaintiff indicated that his pain was improving but that he still had some low and mid-back pain and was continuing to use a lumbar brace. (Tr. 633-634). X-rays indicated that the hardware was in the proper position and that the disc heights normally aligned. (Tr. 633-634).

Plaintiff followed up with Dr. Calabrese in March of 2014 after his spine surgery. (Tr. 527). Plaintiff was continuing with pain management and had been prescribed OxyContin and Oxycodone, both narcotic pain medications. (Tr. 532). During an April 2, 2014 follow-up with Dr. Vigna, plaintiff reported thoracic pain and pain between his shoulder blades. (Tr. 628). Plaintiff reported that he could sit, stand or walk for only five minutes at a time and that he needed to change position frequently. (*Id.*). During an appointment with Dr. Vigna on June 4, 2014, plaintiff reported continued moderate lower back pain, that he could walk two blocks before needing to stop, and that he needed to change positions frequently. (Tr. 623). Dr. Vigna opined that plaintiff would not be capable of returning to his past work as a laborer and ordered a functional capacity evaluation. (Tr. 624-625). Plaintiff had a final follow-up visit with Dr. Calabrese on June 26, 2014. (Tr. 516-519). Plaintiff continued to complain of aching and stabbing pain in his mid and low-back which he rated as a level seven out of ten that day. (*Id.*). He reported restricted movement and weakness in activities of daily living, only being able to walk one block without difficulty, and the need to change positions every few minutes when sitting or standing. (Tr. 516). Dr. Calabrese found that plaintiff had continued significant tenderness in his spine and severe bilateral myospasms. (Tr. 518). In his notes of the visit, Dr. Calabrese indicated that Dr. Vigna had ordered a functional capacity

evaluation. (Tr. 516-518). Dr. Calabrese then opined that plaintiff was unable to return to a position involving heavy labor but would be able to work in a "primarily sedentary position" and that he would "defer to the ordered Functional Capacity Evaluation to determine [plaintiff's] permanent work restrictions." (Tr. 522-523).

Plaintiff began treating with Dr. Eugene Gosy of Pain Treatment & Neurology, LLP in July of 2014. (Tr. 727). During an examination on July 22, 2014, Dr. Gosy found that plaintiff had tenderness at the middle and lower lumbar regions bilaterally. (Tr. 729). He diagnosed plaintiff with thoracic spine pain, lumbago, and neuritis or radiculitis. (*Id.*). He determined that plaintiff should continue to take OxyContin and take Norco for breakthrough pain. (*Id.*). He opined that plaintiff was 75% disabled for purposes of workers' compensation benefits. Plaintiff treated at Dr. Gosy's office approximately ten more times between September 2014 and August of 2015. (Tr. 704, 707, 710, 713, 716, 719, 724-726, 731, 732). No changes were made in his prescription pain medication and Dr. Gosy continued to find that plaintiff was 75% impaired for purposes of workers' compensation benefits. (*Id.*). On October 20, 2015, Dr. Gosy's office provided a letter indicating that plaintiff cannot "have gainful employment now or in the future" due to his chronic lumbar back pain and radiculopathy. (Tr. 732). The letter was not signed by a doctor. (*Id.*).

Plaintiff again saw Dr. Vigna on September 5, 2014. (Tr. 619). Plaintiff reported that he fell on his back at home and that his pain had increased as a result. (Tr. 619). He reported pain of a level nine out of ten when bending forward. (*Id.*). Plaintiff also told Dr. Vigna that he did not go to his functional capacity evaluation due to an increase in pain. (*Id.*). He was continuing to take prescription pain medication, including Oxycontin.

12

(*Id.*).  Dr. Vigna opined that plaintiff had a temporary impairment of 100%.  (Tr. 621).  On October 31, 2014, Dr. Vigna noted that plaintiff continued to have persistent pain that was uncharged since the surgery, and recommended a spinal cord stimulator.  (Tr. 610).  He found plaintiff to have a temporary impairment of 75 %.  (Tr. 611).  On December 17, 2014, plaintiff reported to Dr. Vigna that he was still having consistent back pain, that he could sit or stand for less than five minutes at a time and that he could walk for only 10 minutes at a time.  (Tr. 605).  Plaintiff continued to take his prescription pain medication, including Oxycontin.  (Tr. 605).  Dr. Vigna noted that there was some suggestion of screw loosening and again ordered a functional capacity evaluation.  (Tr. 607).

### *ALJ's Reasoning*

The ALJ found that plaintiff could perform light work with the additional restrictions of no repetitive bending or twisting from the waist and reaching overhead.[7]  (Tr. 22).  In formulating the RFC, the ALJ relied most heavily on the opinions of Dr. Ring and Dr. Brothman.  (Tr. 27).  The ALJ reasoned that Dr. Ring and Dr. Brotherman had a "longitudinal treating relationship with the [plaintiff]" and that "such treating sources are in the best position to determine the [plaintiff's] overall physical restrictions."  (*Id.*).  The ALJ gave little weight to Dr. Gosy's opinion that plaintiff is "totally disabled" because it lacked specificity and was conclusory.  (*Id.*).  The ALJ also declined to credit Dr. Gosy's opinion as to plaintiff's work capabilities because it differed from Dr. Ring and Dr. Brotherman.  (*Id.*).  The ALJ did not state what weight, if any, he gave to the opinions of Dr. Calabrese and Dr. Vigna.  (*Id.*).

---

[7] The additional restrictions of no handling, sale or preparation of alcoholic beverages or controlled narcotic substances are not relevant to the Court's determination here.

<u>*The Opinions of Dr. Ring and Dr. Brotherman were Stale*</u>

An ALJ may not rely on "medical source opinions that are conclusory, stale, and based on an incomplete medical record" as substantial evidence to support his RFC findings. *Camille v. Colvin*, 104 F. Supp. 3d 329, 343-44 (WDNY 2015); *aff'd*, 652 F. App'x 25 (2d Cir. 2016). A medical opinion may be stale if it does not account for a plaintiff's deteriorating condition. *See e.g., Jones v. Comm'r of Soc. Sec.*, 10-CV-5831, 2012 U.S. Dist. LEXIS 119010 (EDNY Aug. 22, 2016) (finding that the ALJ should not have relied on a medical opinion in part because it "was 1.5 years stale" as of the plaintiff's hearing date and "did not account for her deteriorating condition."); *Hawkins v. Colvin*, 15-CV-6394, 2016 U.S. Dist. LEXIS 148380 (WDNY Oct. 26, 2016) ("the consultative medical examination report was 'stale' at the time of the ALJ's decision, insofar as the report was issued prior to plaintiff's degenerative disc disease becoming symptomatic."); *Girolamo v. Colvin*, 13-CV-06309, 2014 U.S. Dist. LEXIS 72749 (WDNY May 28, 2014) (ALJ improperly relied upon opinions of consulting physicians rendered "prior to [p]laintiff's second surgery in 2011 and the related diagnostic testing associated therewith.").

Here, the ALJ found that plaintiff could perform light work, meaning that he could lift no more than twenty pounds at a time and frequently lift or carry objects weighing up to ten pounds. *See* 29 C.F.R. § 404.1567(b). He imposed the additional restrictions of no repetitive bending or twisting from the waist and no reaching overhead. (Tr. 22). In formulating the RFC, the ALJ relied predominately on Dr. Ring's and Dr. Brothman's opinions that plaintiff could return to work provided he avoided lifting over 15 to 20 pounds and did not bend, twist or reach overhead. Dr. Ring's and Dr. Brothman's opinions were

rendered on August 8, 2011 and December 27, 2012 respectively. However, as explained in detail above, plaintiff went on to receive a significant amount of treatment for his back injury for the remainder of 2012, all of 2013, all of 2014 and through the initial hearing date of April 23, 2015. Records from this period reveal that plaintiff continued to experience significant pain and limitations as a result of his back injury that exacerbated over time. In August and September of 2013, almost a year after Dr. Brothman rendered his opinion as to plaintiff's work capabilities, Dr. Calabrese diagnosed plaintiff with acute exacerbation of his low-back injury and increased his prescription pain medication. In December of 2013, plaintiff underwent spinal surgery which included a lumbar fusion and the insertion of screws. In April of 2014, four months after the spinal surgery, plaintiff continued to report pain at a level seven out of ten and was found to have significant tenderness in his spine and severe bilateral myospasms. Further, plaintiff reported that he needed to change positions frequently because of pain and could only walk one to two blocks. In June of 2014, Dr. Calabrese opined that plaintiff could work in a "sedentary" position but that he would defer to the results of a functional capacity evaluation. In September of 2014, plaintiff reported an increase in pain to a level nine out of ten after falling at home, and Dr. Vigna noted that plaintiff's pain and other symptoms had not improved since the surgery. In December of 2014, plaintiff continued to have consistent back pain and reported that he could sit or stand for less than five minutes and walk for only ten minutes. Also in December of 2014, Dr. Vigna noted that the screws inserted during plaintiff's back surgery may be loosening.

The Court concludes that the ALJ erred by relying, almost exclusively, on medical opinions rendered three and four years before the hearing when subsequent treatment

records indicate that plaintiff's condition exacerbated over time. The opinions are stale because they were rendered prior to plaintiff's 2013 spinal surgery and 2014 fall. Further, they fail to account for the years of subsequent medical records and treatment notes which detail plaintiff's significant pain and other limitations. These include limitations in his ability to sit, stand or walk for extended periods of time. The Social Security Regulations explain that "[e]ven though the particular weight lifted in a particular job may be very light, a [light duty] job… requires a good deal of walking or standing." *See* S.S.R. 83-10, *Titles II and XVI: Determining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2*, 1983 WL 31251 (S.S.A. 1983). Further, "frequent lifting or carrying requires being on one's feet up to two-thirds of a workday." *Id.* Indeed, the more recent medical evidence calls into question whether plaintiff can lift, carry, sit, walk and stand consistent with the requirements of light work and the findings in the RFC. On remand, the Commissioner should reexamine plaintiff's treatment records for the remainder of 2012, 2013, 2014 and 2015 regarding plaintiff's back injury.

<u>*The ALJ Misapplied the Treating Physician Rule*</u>

The Social Security regulations require an ALJ to give a treating source's opinion as to the nature and severity of a plaintiff's impairments controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. § 416.927(c)(2). *See also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) ("[T]he [Social Security administration] recognizes a treating rule of deference to the views of the physician who has engaged in the primary treatment of the claimant[.]"); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (explaining that the regulations give deference to

treating physicians' opinions because "opinions based on a patient-physician relationship are more reliable than opinions … based solely on an examination for purposes of the disability proceedings themselves."). A treating source is defined as a plaintiff's "own acceptable medical source who provides [plaintiff], or has provided [plaintiff], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [plaintiff]." *See* 20 C.F.R. §404.1527(a)(2).

Here, the ALJ considered Dr. Ring and Dr. Brotherman to be plaintiff's treating physicians. Indeed, the ALJ explained that he gave great weight to their opinions because they have a "longitudinal treating relationship" with plaintiff and because "treating sources are in the best position to determine [a plaintiff's] overall restrictions." (Tr. 27). This analysis was incorrect because neither Dr. Brotherman nor Dr. Ring actually treated plaintiff. Instead, they severed as independent medical examiners who evaluated plaintiff on several occasions for the Workers' Compensation Board. Indeed, each of their medical reports specifically states that the "appointment was for purposes of evaluation only – not for care, treatment, or consultation – and therefore, no doctor patient relationship would result." (Tr. 294, 297, 301, 306, 309). Therefore, not only were the opinions of Dr. Ring and Dr. Brotherman stale, but they were also given undue weight based on the ALJ's faulty assumption that they were plaintiff's treating physicians. *See Southard v. Comm'r of Social Security*, 17-CV-867, 2019 WL 101252 (WDNY Jan. 4, 2019) (doctor who saw plaintiff for the express purpose for furthering his workers' compensation claim was not a treating physician). This error is especially significant here, where the ALJ relied predominately on Dr. Ring's and Dr. Brotherman's opinions in determining that plaintiff could perform light work. In fact, the ALJ rejected the opinion of

one of plaintiff's actual treating physicians, Dr. Gosy, in part because it was contrary to the work capability assessments of Dr. Ring and Dr. Brotherman. Thus, the ALJ's misapplication of the treating physician rule is another ground for remand.

<u>The ALJ Failed to Fully Develop the Record</u>

On March 26, 2012, the Social Security Regulations were amended to delete the provision that imposed, on the ALJ, a duty to recontact a treating physician "when the report from [a plaintiff's] medical source contains a conflict or ambiguity that must be resolved, the report does not [contain all the necessary information,] [or does not] appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Quinn v. Colvin*, 1:15-CV-723, 2016 WL 4255020, *12 n.2 (WDNY Aug. 11, 2016) (*quoting* 20 C.F.R. § 404.1512(e) (before amendment)). Now, where there exists an ambiguity in an opinion by a treating physician, the ALJ has "discretion to 'determine the best way to resolve the inconsistency or insufficiency' based on the facts of the case." *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 505 (SDNY 2014) (*quoting* 20 CFR § 404.1520b(b)(2)). However, the Social Security Regulations continue to "contemplate the ALJ recontacting treating physicians when the additional information needed is directly related to that source's opinion." *Jimenez v. Asture*, 12 Civ. 3477, 2013 WL 4400533, *11 (SDNY Aug. 14, 2013). Thus, while an ALJ is not required to recontact a treating physician to obtain a function by function analysis in every case, remand is appropriate "where the medical record available to the ALJ is not robust enough to obviate the need for a treating physician's opinion." *Hooper v. Colvin*, 199 F. Supp. 3d 796, 815 (SDNY 2016) *See also Greenhause v. Berryhill*, 16 Civ. 10035, 2018 WL 1626347, at *9 (SDNY Mar. 30, 2018) ("The need for a medical source statement from the treating physician

hinges on the circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record.").

On June 4, 2014, Dr. Vigna, plaintiff's treating physician, ordered a functional capacity evaluation to determine plaintiff's work capabilities.  On June 26, 2014, Dr. Calabrese, another treating physician, opined that plaintiff could perform a sedentary position but that he would defer to the results of the functional capacity evaluation ordered by Dr. Vigna to determine plaintiff's permanent work restrictions.  In December of 2014, Dr. Vigna again noted the need for a functional capacity evaluation to determine plaintiff's work capabilities.  However, there is no indication that the functional capacity examination ordered by Dr. Vigna was ever performed.  Thus, the only opinions in the record as to plaintiff's specific work capabilities were from Dr. Ring and Dr. Brotherman.  As explained in detail above, these opinions were stale and were not rendered by treating physicians.  Moreover, two of plaintiff's treating physicians specifically cited the need for an updated functional capacity evaluation to properly assess plaintiff's abilities and plaintiff's most recent treatment records indicate that he may have limitations in his ability to lift, carry, sit, stand and walk.  Here, the medical evidence in the record was not robust enough for the ALJ to sufficiently assess plaintiff's RFC without a more recent functional capacity evaluation or function-by-function analysis.  *See* 20 C.F.R. §416.913(e)(1)-(3) ("the record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity").  On remand, the ALJ must further develop the record by requesting a medical source statement that contains a recent function-by-

function assessment or recent functional capacity evaluation from a medical source and

re-perform the sequential evaluation.[8]

## CONCLUSION

For the foregoing reasons, plaintiff Jason Michael Jeffords' motion for judgment on

the pleadings (Dkt. No. 11) is granted, defendant Commissioner of Social Security's

motion for judgment on the pleadings (Dkt. No. 16) is denied, and the matter is remanded

to the Commissioner for further administrative proceedings consistent with this Decision

and Order.

The Clerk of Court shall take all steps necessary to close this case

**SO ORDERED.**

Dated:      April 18, 2019
            Buffalo, New York

*/s/ Michael J. Roemer*
MICHAEL J. ROEMER
United States Magistrate Judge

---

[8] Plaintiff also argues that instead of rejecting Dr. Gosy's opinion that plaintiff was "totally disabled" because it lacked specificity and was conclusory, the ALJ should have recontacted Dr. Gosy for clarification. (*See* Dkt. No. 11-1 (Plaintiff's Memo of Law))  On remand, the ALJ should also consider seeking additional information from Dr. Gosy as to his opinion that plaintiff is totally disabled.  Plaintiff further argues that remand is warranted because the ALJ did not properly assess his credibility.  (*Id.*)  Because the Court finds this matter should be remanded for all of the reasons stated *infra*, it declines to address this argument. *See Weiland v. Colvin*, 6:16-CV-06100, 2017 U.S. Dist. LEXIS 15947 (W.D.N.Y. Feb. 4, 2017) (where remand was ordered for reconsideration of plaintiff's RFC and further development of the administrative record, the court declined to address plaintiff's credibility arguments since "plaintiff's credibility must be reconsidered on remand upon thorough consideration of the fully developed administrative record")